UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA - JACKSONVILLE DIVISION

IN RE:

ANGELO L. WILLIAMS ,                    CASE NO.: 3:19-bk-03614-JAF
                                        CHAPTER 7

       Debtor(s).

_____/

**<u>CREDITOR'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY</u>**
*Subject Property: 1021 GARDENBRIDGE PL, SAINT CHARLES, MISSOURI 63303*

---

**NOTICE OF OPPORTUNITY TO
OBJECT AND FOR HEARING**

**Pursuant to Local Rule 2002-4, the Court will consider the relief requested in this paper without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the attached proof of service, plus an additional three days for service if any party was served by U.S. Mail. You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated.**

**If you object to the relief requested in this paper, you must file a response with the Clerk of the Court at 801 N. Florida Avenue, Suite 555, Tampa, FL 33602 and serve a copy on the movant's attorney, Ida A. Moghimi-Kian, Attorneys for Creditor, at SHD Legal Group P.A., PO BOX 19519 Fort Lauderdale, FL 33318, and any  other appropriate persons within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing or consider the response and grant or deny the relief requested without a hearing.**

**If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.**

---

      Creditor, New Residential Mortgage LLC ("Creditor"), by and through undersigned counsel and pursuant to 11 U.S.C.  §362(d), Fed. Rule Bankr. P. 4001 and Local Rule 4001-1 , moves this Court for relief from the automatic stay to proceed *in rem*, and states:

     1.      This Court has jurisdiction over the subject matter herein.

     2.      On or about, ANGELO L. WILLIAMS executed and delivered a promissory note

(the "Note"), and ANGELO L. WILLIAMS executed a mortgage securing payment of the Note (the "Mortgage"). Creditor is entitled to enforce the Note, a true and correct copy of which is attached hereto as Exhibit "A".

3.      The Mortgage was recorded on August 8, 2017 in the Official Records Book 6788 at Page 1785 of the Public Records of St. Charles County, Missouri and encumbered the property described in the Mortgage. A true and correct copy of the Mortgage is attached hereto as Exhibit "B". The Creditor is a secured creditor through the Note and Mortgage executed on August 3, 2017 in the amount of $412,250.00.

4.      The Mortgage was subsequently assigned to DITECH FINANCIAL LLC by virtue of an assignment of mortgage (the "Assignment of Mortgage") recorded on July 26, 2018, in the Official Records Book 6953, at Page 1317, of the Public Records of St. Charles County, Missouri. A true and correct copy of the Assignment of Mortgage is attached hereto as Exhibit "C".

5.      The Mortgage was subsequently assigned to NEW RESIDENTIAL MORTGAGE, LLC by virtue of an assignment of mortgage (the "Assignment of Mortgage") recorded on August 29, 2019, in the Official Records Book 7132, at Page 1829, of the Public Records of St. Charles County, Missiouri. A true and correct copy of the Assignment of Mortgage is attached hereto as Exhibit "C".

6.      The Creditor has the right to foreclose on the subject property.

7.      Angelo L. Williams ("Debtor(s)") is in default under the Note and Mortgage and is not adequately protecting the Creditor.

8.      The Debtor(s) filed this voluntary Chapter 7 proceeding on September 24, 2019.

9.      The Creditor holds a security interest in the subject property located at 1021 GARDENBRIDGE PL, SAINT CHARLES, MISSOURI 63303 ("Property"), more fully

described in the Mortgage attached as Exhibit "B"." The legal description for the Property is as follows:

**LOT 11D OF TALBRLDGE VILLAGES D, E & F, A SUBDIVISION IN SAINT CHARLES COUNTY, MISSOURI, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 44 PAGE 139 OF THE SAINT CHARLES COUNTY RECORDS.**

10.     Based on the Debtor's schedules and statement of intentions, the Property is not listed in Schedule C. Pursuant to the Appraisal, attached hereto as Exhibit "D", the property is valued at $466,268.00.

11.     The amount due to the Creditor as of September 30, 2019 is $461,911.62, as evidenced by Exhibit "G" attached ***Affidavit in Support of Creditor's Motion for Relief from the Automatic Stay ("Affidavit").*** The amount due exceeds the Property's value as stated above, so there is no equity in the Property.

12.     The Creditor maintains that cause exists pursuant to 11 U.S.C. §362(d)(1) for the automatic stay to be lifted. The Creditor's security interest in the subject property is being significantly jeopardized by the Debtors' failure to make regular payments under the Note and Mortgage while Creditor is prohibited from pursuing lawful remedies to protect such interest. The default is based on the contractual default. The contractual monthly mortgage payment is $3,196.19, which is comprised of principal and interest as well as escrow if applicable. The Debtor is indebted to the Creditor in the total amount of $461,911.62. See attached Affidavit.

13.     Creditor further seeks relief to, at its option, offer, provide, and enter into any potential loan assistance agreement. Creditor requests that it may contact the Debtor via telephone or written correspondence to offer such an agreement.

14. NewRez LLC dba Shellpoint Mortgage Servicing as servicer for New Residential Mortgage LLC. Any payments made to the Creditor must be sent to: Shellpoint Mortgage

Servicing 55 Beattie Place, Suite 110, Greenville, SC 29601.

15.     Creditor respectfully requests that the Court waive the fourteen (14) day stay of the order granting relief pursuant to Fed. Rule Bankr. P. 4001 (a)(3), so that Creditor can pursue its *in rem* remedies without further delay.

16.     Creditor incurred necessary fees to prosecute this motion. Creditor requests that bankruptcy fees of $750.00 and costs of $181.00 be awarded *in rem* for the Motion.

**WHEREFORE,** Creditor, New Residential Mortgage LLC, respectfully requests that this Court issue an Order terminating or modifying the stay, awarding it fees and costs in the amount of $931.00, waiving the 14 day stay of such order and for any such further relief this Court deems proper and just.

SHD Legal Group P.A.
**Attorneys for Creditor (SHD No. 1497-175124)**
PO BOX 19519
Fort Lauderdale, FL 33318
Phone: (954) 564-0071
Fax:  (954) 564-9252

By:  /s/ Ida A. Moghimi-Kian
      Ida A. Moghimi-Kian
      Florida Bar No.56395
      IMoghimi-Kian@shdlegalgroup.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this day, October 22, 2019, a copy of the foregoing was

furnished electronically and/or via first class U.S. Mail upon:

ANGELO L. WILLIAMS
7777 NORMANDY BLVD
APT 814
JACKSONVILLE, FL 32221-7668
*Debtor(s)*

KEITH D. COLLIER
LAW OFFICES OF KEITH D. COLLIER (JAX)
2770 PARK STREET
JACKSONVILLE, FL 32205
*Attorney for Debtor(s)*

DOREEN ABBOTT
P.O. BOX 56257
JACKSONVILLE, FL 32241-6257
*Trustee*

UNITED STATES TRUSTEE- JAX 7/13
GEORGE  C. YOUNG FEDERAL BUILDING
400 WEST WASHINGTON STREET, STE 1100
ORLANDO, FL 32801
*U.S. Trustee*

SHD Legal Group P.A.
**Attorneys for Creditor (SHD No. 1497-175124)**
PO BOX 19519
Fort Lauderdale, FL 33318
Phone: (954) 564-0071
Fax:  (954) 564-9252

By:  /s/ Ida A. Moghimi-Kian
Ida A. Moghimi-Kian
Florida Bar No.56395
IMoghimi-Kian@shdlegalgroup.com

**EXHIBIT "A"**



# NOTE

August 3, 2017                                St. Louis,                                Missouri
[Date]                                          [City]                                    [State]

1021 Gardenbridge Pl, Saint Charles, MO 63303
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$412,250.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **DAS Acquisition Company, LLC, a Limited Liability Company.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **4.125 %.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **October 1, 2017.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **September 1, 2047,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **12140 Woodcrest Executive, Ste 150
St. Louis, MO 63141**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S. **$1,997.97.**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
Ellie Mae, Inc.                                    Page 1 of 3                                F3200NOT  0107
                                                                                             F3200NOT (CLS)

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A) Late Charge for Overdue Payments**
    If the Note Holder has not received the full amount of any monthly payment by the end of    15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B) Default**
    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C) Notice of Default**
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D) No Waiver By Note Holder**
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E) Payment of Note Holder's Costs and Expenses**
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

    Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

    This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
ANGELO WILLIAMS

Lender: DAS Acquisition Company, LLC
NMLS ID: 227262
Loan Originator: Daniel John Krummel
NMLS ID: 977365

PAY TO THE ORDER OF: Ditech Financial LLC
WITHOUT RECOURSE
DAS Acquisition Company, LLC, a Limited Liability Company

BY:_____
Jayne Siebert, Assistant Vice President
-OR-

BY:_____
Danielle Ploch, Assistant Vice President

[Sign Original Only]

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
Ellie Mae, Inc.                                    Page 3 of 3                                    F3200NOT  0107
                                                                                                 F3200NOT (CLS)

**ALLONGE TO NOTE**

LOAN AMOUNT: 412,250.00

PROPERTY ADDRESS:     1021 Gardenbridge Pl

Saint Charles  MO  63303

ALLONGE TO NOTE DATED: 08/03/2017

IN FAVOR OF: **DAS Acquisition Company, LLC, a Limited Liability Company**

AND EXECUTED BY:      Angelo  Williams

PAY TO THE ORDER OF:  Ditech Financial LLC

WITHOUT RECOURSE: **DAS Acquisition Company, LLC, a Limited Liability Company**

BY   _____

Jayne Siebert

TITLE: Assistant Vice President

OR

BY   _____

Danielle Ploch

TITLE: Assistant Vice President

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this day, October 9, 2019, a copy of the foregoing was

furnished electronically and/or via first class U.S. Mail upon:

ANGELO L. WILLIAMS
7777 NORMANDY BLVD
APT 814
JACKSONVILLE, FL 32221-7668
*Debtor(s)*

KEITH D. COLLIER
LAW OFFICES OF KEITH D. COLLIER (JAX)
2770 PARK STREET
JACKSONVILLE, FL 32205
*Attorney for Debtor(s)*

DOREEN ABBOTT
P.O. BOX 56257
JACKSONVILLE, FL 32241-6257
*Trustee*

UNITED STATES TRUSTEE- JAX 7/13
GEORGE  C. YOUNG FEDERAL BUILDING
400 WEST WASHINGTON STREET, STE 1100
ORLANDO, FL 32801
*U.S. Trustee*

SHD Legal Group P.A.
**Attorneys for Creditor (SHD No. 1497-175124)**
PO BOX 19519
Fort Lauderdale, FL 33318
Phone: (954) 564-0071
Fax:  (954) 564-9252

By: /s/ Ida A. Moghimi-Kian
    Ida A. Moghimi-Kian
    Florida Bar No.56395
    IMoghimi-Kian@shdlegalgroup.com

**EXHIBIT "B"**

20170808000497960 D T
Bk:DE6788 Pg:1785
08/08/2017 04:07:13 PM  1/17
$69.00
**CERTIFIED-FILED FOR RECORD**
**Barbara J. Hall**
**Recorder of Deeds**
**St. Charles County, Missouri**
**BY:JJAMES**

———————————————— Space above this line for recording data —

**When recorded, return to:**
**DAS Acquisition Company, LLC**
**12140 Woodcrest Executive, Ste 150**
**St. Louis, MO 63141**
**314-628-2214**

## DEED OF TRUST COVER PAGE
### For Recorder of Deeds Indexing Purposes

This Cover Page **MUST** be attached with your recordable document

1. Document Being Recorded: Deed of Trust
2. Date of Document: **August 3, 2017**
3. Grantor/Borrower Name(s) for Indexing Purposes: **ANGELO WILLIAMS, SINGLE MAN.**
   **1021 Gardenbridge Pl**
   *Saint Charles, MO 63303*

4. Grantee/Lender Name and Address for Indexing Purposes: **DAS Acquisition Company, LLC**
   **12140 Woodcrest Executive, Ste 150**
   **St. Louis, MO 63141**

5. Legal Description or Location of Legal Description in the Document:
   **Lot 11D of Talbridge Villages D, E & F, a subdivision in Saint Charles County, Missouri, according to the plat thereof recorded in Plat Book 44 Page 139 of the Saint Charles County Records.**
   **APN #: T080800020**

6. Reference Book(s) and Page(s), if required: **N/A**

Missouri Recording Cover Page
Ellie Mae, Inc.                                                   MOCOVERL  0315
                                                                  MOCOVERL (CLS)

Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **August 3, 2017.**
The Note states that Borrower owes Lender **FOUR HUNDRED TWELVE THOUSAND TWO HUNDRED FIFTY AND NO/100\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*** Dollars (U.S. **$412,250.00**                        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **September 1, 2047.**

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider     ☐ Second Home Rider
☐ Balloon Rider     ☒ Planned Unit Development Rider     ☐ Other(s) [specify]
☐ 1-4 Family Rider     ☐ Biweekly Payment Rider
☐ V.A. Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower

**MISSOURI**– Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3026 1/01**
Ellie Mae, Inc.                Page 2 of 13                      MOEDEDL  0315
                                                                      MOEDEDL (CLS)

irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the **County** of **St. Charles**

[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]:

**Lot 11D of Talbridge Villages D, E & F, a subdivision in Saint Charles County, Missouri, according to the plat thereof recorded in Plat Book 44 Page 139 of the Saint Charles County Records.**
**APN #:** █████████

which currently has the address of  **1021 Gardenbridge Pl, Saint Charles,**

[Street] [City]

Missouri  **63303**                       ("Property Address"):
         [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.



Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require

under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might

MISSOURI – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3026 1/01
Ellie Mae, Inc.

MOEDEDL 0315
MOEDEDL (CLS)

provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to; or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or

condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide

a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mort-gage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender

otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note

or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest



in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the

MISSOURI – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3026 1/01
Ellie Mae, Inc.
MOEDEDL  0315
MOEDEDL (CLS)

Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Lease of the Property. Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

26. Homestead Exemption. Borrower hereby waives all homestead exemptions in the Property to which Borrowers would otherwise be entitled under Applicable Law.

27. Notice. Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3026 1/01
Ellie Mae, Inc.

MOEDEDL  0315
MOEDEDL (CLS)



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
**ANGELO WILLIAMS**

**STATE OF MISSOURI**                                                    **ST CHARLES County ss:**

On this ___3___ day of ___August___ in the year ___2017___, before me, the undersigned notary public, personally appeared ANGELO WILLIAMS, known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

My Term Expires: ___5-12-21___

KIM NOEL
My Commission Expires
May 12, 2021
St. Charles County
Commission #13710057

_____
**Notary Public**

Lender: DAS Acquisition Company, LLC
NMLS ID: 227262
Loan Originator: Daniel John Krummel
NMLS ID: 977365

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **3rd** day of **August, 2017** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **DAS Acquisition Company, LLC, a Limited Liability Company**

(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at: **1021 Gardenbridge Pl, Saint Charles, MO 63303.**

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in **COVENANTS, CONDITIONS AND RESTRICTIONS**

(the "Declaration").
The Property is a part of a planned unit development known as **Talbridge Vlgs**

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.  PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners

Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to ensure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of

self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F.  **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ **(Seal)**
**ANGELO WILLIAMS**

MULTISTATE PUD RIDER--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3150 1/01
Ellie Mae, Inc.                                              Page 3 of 3                                            F3150RLU  0115
                                                                                                                  F3150RLU (CLS)

EXHIBIT "C"

**2018072600421670 ASGMT**
**Bk:DE6953 Pg:1317**
**07/26/2018 08:20:17 AM 1/2**
**$24.00**
**CERTIFIED-FILED FOR RECORD**
**Barbara J. Hall**
**Recorder of Deeds**
**St. Charles County, Missouri**
**BY:KAUERSWALD**

## ASSIGNMENT OF MORTGAGE/DEED OF TRUST

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby acknowledged, the undersigned, (GRANTOR) **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR DAS ACQUISITION COMPANY, LLC, ITS SUCCESSORS AND ASSIGNS, (ASSIGNOR), (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026)** by these presents does convey, grant, assign, transfer and set over the described mortgage/deed of trust together with all interest secured thereby, all liens, and any rights due or to become due thereon to (GRANTEE) **DITECH FINANCIAL LLC, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS 2100 E. ELLIOT RD., T314, TEMPE, AZ 85284 (800)643-0202, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE)**

Said Mortgage/Deed of Trust dated 08/03/2017, executed by **ANGELO WILLIAMS** to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR DAS ACQUISITION COMPANY, LLC, ITS SUCCESSORS AND ASSIGNS** and recorded in the Recorder's Office of **ST. CHARLES** County, **Missouri**, in **Book 6788 and Page 1785**, on the property as described in said Mortgage/Deed of Trust, to wit:

Legal Description: LOT 11D OF TALBRIDGE VILLAGES D, E & F, A SUBDIVISION IN SAINT CHARLES COUNTY, MISSOURI, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 44 PAGE 139 OF THE SAINT CHARLES COUNTY RECORDS.

Property is commonly known as: 1021 GARDENBRIDGE PL, SAINT CHARLES, MO 63303.

This Assignment was executed **this 25th day of July in the year 2018**.

DTFAV ████████ADMASG MIN ████████ MERS PHONE 1-888-679-6377 MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026 DOCR T251807-09:18:31 [C-2] EFRMMO1



Dated this 25th day of July in the year 2018.
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR DAS ACQUISITION COMPANY, LLC, ITS SUCCESSORS AND ASSIGNS**



**HOLLY HARDY**
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

STATE OF FLORIDA       COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me on this 25th day of July in the year 2018, by Holly Hardy as VICE PRESIDENT of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR DAS ACQUISITION COMPANY, LLC, ITS SUCCESSORS AND ASSIGNS, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**NICOLE SHIELDS**
**COMM EXPIRES: 08/05/2020**

NICOLE SHIELDS
Notary Public – State of Florida
My Comm. Expires August 5, 2020
Commission # GG126925

**Document Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
When Recorded Return To: Ditech Financial LLC, C/O Nationwide Title Clearing, Inc. 2100 Alt. 19 North, Palm Harbor, FL 34683
DTFAV    ADMASG  MIN    MERS PHONE 1-888-679-6377 MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026  DOCR T251807-09:18:31 [C-2]  EFRMMO1

20190829000463100 ASGMT
Bk:DE7132 Pg:1829
08/29/2019 10:50:14 AM 1/1
$21.00
CERTIFIED-FILED FOR RECORD
Mary E. Dempsey
Recorder of Deeds
St. Charles County, Missouri
BY:JJAMES

**MISSOURI**
COUNTY OF **ST. CHARLES**
LOAN NO ███████

RETURN TO: **FIRST AMERICAN MORTGAGE SOLUTIONS, 1795 INTERNATIONAL WAY, IDAHO FALLS, ID** 83402, PH. 208-528-9895

# ASSIGNMENT OF DEED OF TRUST

KNOW ALL MEN BY THESE PRESENTS, that for value received, receipt thereof is hereby acknowledged, **DITECH FINANCIAL, LLC, BY NEWREZ LLC F/K/A NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING, ITS ATTORNEY IN FACT**, located at **55 BEATTIE PLACE SUITE 110 MS#001, GREENVILLE, SC 29601**, (Grantor) Assignor, does hereby convey unto **NEW RESIDENTIAL MORTGAGE, LLC**, located at **1345 AVENUE OF THE AMERICAS, 7TH FLOOR, NEW YORK, NY 10105**, (Grantee) Assignee, its successors and assigns, all of Assignor's rights, title, and interest of, in and to that certain Deed of Trust dated **AUGUST 03, 2017**, executed by **ANGELO WILLIAMS, SINGLE MAN**, Trustor, for the benefit of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), AS NOMINEE FOR DAS ACQUISITION COMPANY, LLC, ITS SUCCESSORS AND ASSIGNS**, Original Beneficiary, and duly filed for record in County Recorder's Office for **ST. CHARLES** County, State of **MISSOURI**, and recorded on **AUGUST 08, 2017**, as Instrument No. **20170808000497960** in Book **DE6788** at Page **1785**. Described hereinafter as follows:

LEGAL DESCRIPTION: **LOT 11D OF TALBRIDGE VILLAGES D, E & F, A SUBDIVISION IN SAINT CHARLES COUNTY, MISSOURI, ACCORDING TO THE PLAT THEREOF RECORDED IN PLAT BOOK 44 PAGE 139 OF THE SAINT CHARLES COUNTY RECORDS.**

TOGETHER with all rights, title, and interest accrued or to accrue under said Mortgage.
IN WITNESS WHEREOF, the undersigned has caused this Instrument to be executed on 8/27/2019.
**DITECH FINANCIAL, LLC, BY NEWREZ LLC F/K/A NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING, ITS ATTORNEY IN FACT**

**CYNTHIA M. BROCK, VICE PRESIDENT**

STATE OF **SOUTH CAROLINA**          COUNTY OF **GREENVILLE**    ) ss.
On 8/27/2019, before me, Sandra D McCoy, personally appeared **CYNTHIA M. BROCK** known to me to be the **VICE PRESIDENT** of **NEWREZ LLC F/K/A NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING AS ATTORNEY-IN-FACT FOR DITECH FINANCIAL LLC** the corporation that executed the instrument or the person who executed the instrument on behalf of said corporation, and acknowledged to me that such corporation executed the same.

Sandra D McCoy          COMMISSION EXPIRES:
06/07/2026
NOTARY PUBLIC
SH8070117IM - AM - MO

Page 1 of 1

SANDRA D MCCOY
My Commission Expires
NOTARY PUBLIC
06-07-2026
STATE OF SOUTH CAROLINA

**MERS PHONE: 1-888-679-6377**

EXHIBIT "D"

✉ SHARE

City, State, or Zip 🔍

1021 Gardenbridge Pl, Saint Charles, MO 63303



# 1021 Gardenbridge Pl,
## Saint Charles, MO 63303

4 beds · 3 baths · 4,122 sqft

SOLD: $425,000
Sold on 08/03/17

Zestimate®: $466,268

EST. REFI PAYMENT
Est. Refi Payment:
$1,585/mo



*Note: This property is not currently for sale or for rent. The description below may be from a previous listing.*

Very convenient location to restaurants, shopping and highways 70/94/364. Immediate closing and possession are available for this prestigious full brick front 2 story with 3 car garage. Super-sized 4200+ sq ft floor plan featuring all of today's most desired upgrades/options. There's hardwood flooring throughout the main level, a 2 story foyer, tons of 42in custom cabinets w/crown, diamond fleck solid surface counter tops including a lg center island work station w/sink and a desk area, 9 ft
ceilings main lvl & foundation, a bay window in the great rm, cathedral and coffered ceilings upstairs, french doors to main floor den/office, sep dining rm w/crown and chair rail, 2 fireplaces-one in the hearth rm and one in the great rm, top of the line stainless steel appliances boasting a dbl oven, a 5 burner gas cook top, a microwave and dishwasher. All bedrooms have private access to bathrooms. Seller is offering a $5000 buyer credit with acceptable offer to close by 2/28/17
...

WHAT I LOVE ABOUT THE HOME

Beautiful neighbourhood. Close to HWY 70, HWY 364, HWY 94, theaters, shopping, hospital, restaurants, katy trail.

## Facts and Features

| | Type | | Year Built | | Heating |
|---|---|---|---|---|---|
| | Single Family | | 2008 | | No Data |
| | Cooling | | Parking | | Lot |
| | No Data | | 3 spaces | | 0.26 acres |

INTERIOR FEATURES

**Bedrooms**
Beds: 4
Bedroom Description: **Master Bdr. Suite**

**Bathrooms**
Master Bath Descr.: **Full Bath, Double Sink, Whirlpool & Sep Shwr**

**Other Rooms**

Kitchen: Breakfast Bar, Center Island, Custom Cabinetry, SolidSurfaceCounter, Breakfast Room, Hearth Room, Walk-In Pantry

Dining: Separate Dining

**Appliances**

Appliances: Range Hood, Gas Cooktop

**Flooring**

Floor size: 4,122 sqft

Flooring: Carpet, Hardwood

## Home Value

### Zestimate

### $466,268

| ZESTIMATE RANGE | LAST 30 DAY CHANGE | ONE YEAR FORECAST |
|---|---|---|
| $424,000 - $513,000 | +$547 (+0.1%) | $470,278 (+0.9%) |

## Price / Tax History

| DATE | EVENT | PRICE | | AGENTS | |
|---|---|---|---|---|---|
| 08/03/17 | Sold | $425,000 | -3.3% | | ∨ |
| 06/20/17 | Pending sale | $439,500 | | | ∨ |
| 06/12/17 | Price change | $439,500 | -1.2% | | ∨ |
| 05/25/17 | Price change | $445,000 | -1.1% | | ∨ |
| 05/11/17 | Price change | $450,000 | -3.2% | | ∨ |
| 04/25/17 | Price change | $465,000 | -0.5% | | ∨ |
| 02/15/17 | Price change | $467,500 | -1.5% | | ∨ |
| 01/07/17 | Price change | $474,500 | -2.2% | | ∨ |
| 08/17/16 | Price change | $485,000 | -2.0% | | ∨ |
| 07/20/16 | Price change | $495,000 | -0.2% | | ∨ |
| 06/10/16 | Price change | $495,900 | -0.5% | | ∨ |
| 05/12/16 | Listed for sale | $498,500 | +21.9% | | ∨ |
| 04/15/09 | Sold | $409,109 | | | ∨ |

## Neighborhood: 63303

| MEDIAN ZESTIMATE | MARKET TEMP |
|---|---|
| $240,900 | Hot |

⊕ 2.9%
Past 12 months

Zillow predicts will rise 2.8% next year, compared to a 4.3% increase for Saint Charles as a whole. Among 63303 homes, this home is valued 98.1% more than the midpoint (median) home, but is valued 23.7% less per square foot.

🚶 Walk Score ®  **4**  (Car-Dependent)

**NEIGHBORHOOD MAP**



**NEARBY HOMES**

<  >

OFF MARKET: ZESTIMATE
**$466,811** 4 bds · 2 ba · 3,550 sqft
1017 Gardenbridge Pl, Saint Charles, MO

OFF MARKET: ZESTIMATE
**$364,625** 4 bds · 3 ba · 2,666 sqft
1900 Talbridge Sq, Saint Charles, MO

## Nearby Schools in Saint Charles

| GREATSCHOOLS RATING | | GRADES | DISTANCE |
|---|---|---|---|
| **6** out of 10 | Harvest Ridge Elementary | K-5 | 1.0 mi |
| **4** out of 10 | Hardin Middle | 7-8 | 2.2 mi |
| **8** out of 10 | Francis Howell North High | 9-12 | 3.0 mi |

Data by GreatSchools.org ⓘ

**About the ratings:** Historically, GreatSchools ratings have been based solely on a comparison of standardized test results for all schools in a given state. As of September 2017, the GreatSchools ratings also incorporate additional

information, when available, such as college readiness, academic progress, advanced courses, equity, discipline and attendance data. GreatSchools ratings are designed to be a starting point to help parents compare schools, and should not be the only factor used in selecting the right school for your family.

**Disclaimer:** School attendance zone boundaries are provided by a third party and subject to change. Check with the applicable school district prior to making a decision based on these boundaries.

## Similar Homes for Sale



**FOR SALE**
$415,000
4 beds, 4.0 baths, 3078 sqft
1084 Pierpoint Ln, Saint Char



**FOR SALE**
$579,999
4 beds, 4.0 baths, 3660 sqft
340 Sturbridge Dr, Saint Char

## Nearby Similar Sales

**SOLD: $359,900**
Sold on 8/19/2019
4 beds, 3.0 baths, 3997 sqft
2017 Montclair Manor Dr, Saint Charles, MO 63303

**SOLD: $369,000**
Sold on 2/22/2019
4 beds, 3.0 baths, 2716 sqft
1150 Shorewinds Trl, Saint Charles, MO 63303

**SOLD: $375,000**
Sold on 8/12/2019
4 beds, 3.0 baths, 3082 sqft
1045 Pierpoint Ln, Saint Peters, MO 63303

**SOLD: $379,000**
Sold on 6/13/2019
4 beds, 4.0 baths, 3342 sqft
1053 Pierpoint Ln, Saint Charles, MO 63303

**SOLD: $399,000**
Sold on 11/15/2018
5 beds, 4.0 baths, 3230 sqft
1920 Talbridge Sq, Saint Charles, MO 63303

# EXHIBIT "E"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA - JACKSONVILLE DIVISION

IN RE:

ANGELO L. WILLIAMS,

CASE NO.: 3:19-bk-03614-JAF
CHAPTER 7

Debtor(s).

_____/

### AFFIDAVIT IN SUPPORT OF CREDITOR'S MOTION
### FOR RELIEF FROM THE AUTOMATIC STAY

STATE OF _South Carolina_ )

COUNTY OF _Greenville_ )

_Anita Robertson_ being first duly sworn on oath, deposes and states as follows:

1.     I am over the age of eighteen and am authorized to make this affidavit on behalf of NewRez

LLC dba Shellpoint Mortgage Servicing as servicer for ("Servicer") as servicing agent for New

Residential Mortgage LLC ("Movant").

2.     I am presently a _Bankruptcy Case Mgr_ for Servicer. If sworn as a witness I can

competently testify to the matters stated herein. The statements set forth in this Affidavit are true

and correct to the best of my knowledge and belief.

3.     In this position, I have access to the business records and files of Movant and my

responsibilities include ascertaining and verifying amounts due and payable as to delinquent

bankruptcy accounts. I have personal knowledge of the matter in which these business records are

1497-175124

created and maintained. I have access to the books, records and files that pertain to the Promissory Note and Mortgage (from time to time jointly referred to as the "Loan").

4.      These records (which include data compilations, electronically imaged documents, and others) are: (a) made at or near the time of the occurrence of the matters set forth by, or from information provided by, persons with knowledge of the activity and transactions reflected in such records; and (b) kept as a regular practice and in the ordinary course of business conducted by Movant. It is the regular practice of Movant to make such records. In connection with making this Affidavit, I reviewed and relied on those business records concerning the loan which is the subject of this proceeding.

5.      Servicer is providing mortgage loan services to Movant, and is authorized to act on the Movant's behalf. Movant is holder of a note or loan agreement ("Note") for this Loan, bearing the date of August 3, 2017 in which the Debtor(s), ANGELO L. WILLIAMS, promised to pay the sum of $412,250.00. To secure the note Debtor(s), ANGELO L. WILLIAMS, executed a mortgage ("Mortgage") securing the Note and all obligations of the Debtor(s), ANGELO L. WILLIAMS, under and with respect to the Note. The Note is secured by the property, located at 1021 GARDENBRIDGE PL, SAINT CHARLES, Missouri, 63303 referenced in the Motion as Exhibit "A."

6.      The unpaid principal balance of this loan as of September 30, 2019, as reflected in Movant's business records, is $409,914.55, together with accrued interest in the amount of $29,525.05, escrow advances in the amount of $17,441.10, recoverable costs in the amount of $5,030.92 for a combined total of $461,911.62

7.      As of the date of this affidavit, Movant has not received the payments that were due with respect to this Loan for the months of February 1, 2018 to present, as reflected in Movant's business records.

8.      The following chart sets forth those post-petition payments due pursuant to the terms of the Note and Mortgage, which have been missed by the Debtor(s) as of the date of this Affidavit:

| Number of Missed Payments | From | To | Monthly Payment | Total Missed |
|---|---|---|---|---|
| 1 | 10/1/2019 | 10/1/2019 | $3,196.19 | $3,196.19 |

9.      As of September 30, 2019, the total post-petition arrearage due is $4,127.19. The post-petition fees incurred are $931.00.

10.     The next payment under the terms of the Note will come due on November 1, 2019 and is in the amount of $3,196.19.

11.     The sums set forth in this affidavit do not include any late charges, escrow advances, attorneys' fees, costs, or other fees and charges that might otherwise be included in the event that a payoff is requested or provided.

12.     Movant has retained counsel to pursue this motion and has incurred attorneys' fees for which it seeks reimbursement.

13.     The Note and any Supplemental Riders, Amendments, Modifications, as well as the Mortgage and Assignments of the Mortgage, and any Schedule of Pre and Post-Petition Debt attached to the Motion for Relief from Stay as Exhibits are true and accurate copies of originals.

14.    This concludes my affidavit.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based upon the personal knowledge of the Movant's business records.

FURTHER AFFIANT SAYETH NOT.

By: _____
                     Signature

*Anita Robertson*
Print Name

On behalf of
*NewRez LLC dba Shellpoint Mtg*
Its: *Bankruptcy Case Mgr* *Servicing*

STATE OF *South Carolina*

COUNTY OF *Greenville*

Sworn to (or affirmed) and subscribed before me, this *17th* day of *October*, 20*19*, by *Anita Robertson* (Name of Affiant), (personally known) to me to be the person who executed this Affidavit on behalf of the entity therein named.

Witness my hand and official seal

_____
(Signature of Notary Public)

*Teresa H. Hubner*
Print type or stamp commission name of Public)

SEAL OR STAMP
Notary

My Commission Expires:
*01/23/2026*

1497-175124 YB.

1497-175124